UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SELINA MARIE RAMIREZ, | § | |
| individually and as Independent | § | |
| Administrator of, and on behalf of, the | § | |
| ESTATE OF GABRIEL EDUARDO | § | |
| OLIVAS and the heirs-at-law of | § | |
| GABRIEL EDUARDO OLIVAS, and as | § | |
| parent, guardian, and next friend of and | § | |
| for female minor S.M.O.; and GABRIEL | § | CIVIL ACTION NO. 3:19-cv-01529-L |
| ANTHONY OLIVAS, individually, | § | |
| | § | JURY DEMANDED |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| CITY OF ARLINGTON, TEXAS; | § | |
| JEREMIAS GUADARRAMA; and | § | |
| EBONY N. JEFFERSON, | § | |
| | § | |
| Defendants. | § | |

## FIRST AMENDED PLAINTIFFS' ORIGINAL COMPLAINT

> **City of Arlington custom, policy, and/or practice, and two Arlington police officers, caused Gabriel Olivas' horrific death. Defendant officers Tased him while he was covered with gasoline. As expected, Mr. Olivas caught fire, suffered burns over approximately 85% of his body, and died within a few days.**



Table of Contents

I.    Introductory Allegations ....................................................................................... 4

      A.    Parties ............................................................................................................ 4

      B.    Jurisdiction and Venue ................................................................................. 5

II.   Factual Allegations .................................................................................................. 6

      A.    Introduction ................................................................................................... 6

      B.    Gabriel Eduardo Olivas ................................................................................ 6

      C.    Officer Guadarrama and Officer Jefferson Unreasonably Tase Mr. Olivas,
            Causing Him to Catch Fire, Suffer Horrific Burns, Linger, and Die ..................... 7

            1.    Statements ........................................................................................... 8

                  a.    Officer Scott (#2835) ............................................................... 8

                  b.    Corporal Ray (#2573) ............................................................. 10

                  c.    Officer Jeremias Guadarrama (#2514).................................... 10

                  d.    Sergeant Ebony N. Jefferson (#2116)..................................... 14

                  e.    Officer Caleb Elliott (#3007) .................................................. 16

            2.    Mr. Olivas' Medical Condition at the Scene ............................................ 23

            3.    Autopsy ............................................................................................... 24

      D.    Death Investigation .................................................................................... 24

            1.    Taser Analysis by Axon Enterprise, Inc. (f/k/a Taser International,
                  Inc.) ....................................................................................................... 24

            2.    Scene Investigators ............................................................................ 26

            3.    Arlington Police Department Homicide Unit ......................................... 27

      E.    Defendant Officers' Experience and Training ............................................ 31

            1.    2017 Taser Training .......................................................................... 31

            2.    Texas Commission on Law Enforcement Records .................................. 33

      F.    Defendant Police Officers Acted in an Unreasonable, Unconstitutional
            Manner ......................................................................................................... 38

      G.    City of Arlington's *Monell* Liability......................................................... 39

            1.    City of Arlington's Policy Regarding Escalation in Force was a
                  Moving Force Behind and Proximately Caused Mr. Olivas' Death ........ 40

            2.    City of Arlington's Policy, Practice, and/or Custom of Allowing
                  Officers to Use a Taser Against a Person Doused with Gasoline was
                  a Moving Force Behind and Proximately Caused Mr. Olivas' Death
                  ............................................................................................................... 42

3.   City of Arlington's Policy, Practice, and/or Custom of Continuing to Employ Officer Guadarrama After Numerous Reprimands was a Moving Force Behind and Proximately Caused Mr. Olivas' Death ......... 42

4.   City of Arlington's Failure to Discipline Sergeant Jefferson and/or Officer Guadarrama is Evidence of Arlington's Pre-Existing Unconstitutional Policy, Practice, and/or Custom .................................... 44

III.   Causes of Action ............................................................................................... 44

A.   Cause of Action Against Defendants Sergeant Jefferson and Officer Guadarrama and Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights ............................................................................. 44

B   Cause of Action Against City of Arlington Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights ................................................... 47

IV.   Concluding Allegations ...................................................................................... 50

A.   Conditions Precedent ............................................................................ 50

B.   Use of Documents .................................................................................. 50

C.   Jury Demand .......................................................................................... 51

D.   Prayer .................................................................................................... 51

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs file this amended complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff Selina Marie Ramirez ("Ms. Ramirez" or "Selina") is a natural person who resides and did reside and was domiciled in Texas at all relevant times.  Ms. Ramirez was Gabriel Eduardo Olivas' wife at the time of Mr. Olivas' death.  Gabriel Eduardo Olivas is referred in this pleading as "Gabriel" and/or "Mr. Olivas."  Ms. Ramirez brings claims in this lawsuit individually and as the Independent Administrator of the Estate of Gabriel Eduardo Olivas. Ms. Ramirez also brings claim by and on behalf of female minor S.M.O. as S.M.O.'s mother, guardian, and next friend. S.M.O. was Gabriel's daughter at the time of Gabriel's death. Ms. Ramirez asserts any and all claims available in her capacity as the Independent Administrator regarding Gabriel's death, both survival claims and wrongful death claims, including all claims on behalf of the Estate and all of Gabriel's heirs-at-law including but not necessarily limited to Ms. Ramirez and Gabriel's children – Gabriel Anthony Olivas and female minor S.M.O.   Letters of independent administration were issued to Ms. Ramirez on or about August 22, 2018, in Cause Number 2018-PR00844-2, in the Probate Court No. 2 of Tarrant County, Texas, in a case styled *In the Estate of Gabriel Eduardo Olivas, Deceased*.

2.      Plaintiff Gabriel Anthony Olivas is a natural person who resides and did reside and was in domiciled in Texas all relevant times. Gabriel Anthony Olivas was Mr. Olivas' son at the time of Gabriel's death.  Gabriel Anthony Olivas brings claims in this lawsuit individually.

3.      Defendant City of Arlington, Texas ("Arlington" or "City of Arlington") is a Texas incorporated municipality/city.   Arlington has been served with process and has made an

First Amended Plaintiffs' Original Complaint – Page 4 of 54

appearance in this case. Arlington acted or failed to act at all relevant times, in accordance with its customs, practices, and/or policies, through its policymakers, chief policymakers, employees, agents, representatives, and/or police officers and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983).

4.      Defendant Jeremias Guadarrama ("Officer Guadarrama" or "Mr. Guadarrama") is a natural person who resides and is domiciled in Fort Worth, Texas. Mr. Guadarrama has been served with process and has made an appearance in this case. Mr. Guadarrama is being sued in his individual capacity and acted at all relevant times under color of State law. Mr. Guadarrama was employed by and/or was the agent and/or designee and/or contractor of and for City of Arlington at all such times and acted or failed to act in the course and scope of his duties for City of Arlington.

5.      Defendant Ebony N. Jefferson ("Officer Jefferson," "Mr. Jefferson," or "Sergeant Jefferson") is a natural person who resides and is domiciled in Dallas, Texas. Mr. Jefferson has been served with process and has made an appearance in this case. Mr. Jefferson is being sued in his individual capacity and acted at all relevant times under color of State law. Mr. Jefferson was employed by and/or was the agent and/or designee and/or contractor of and for City of Arlington at all such times and acted or failed to act in the course and scope of his duties for City of Arlington.

B.      Jurisdiction and Venue

6.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights. This suit arises under the United States Constitution and a federal statute - 42 U.S.C. § 1983.

7.      The court has personal jurisdiction over City of Arlington because it is a Texas City.  The court has personal jurisdiction over the natural person Defendants because they reside in, are domiciled in, and are citizens of Texas.

8.      Venue is proper in the Dallas Division of the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b)(1).  It is the division in the district in which Defendant Mr. Jefferson resides, and all Defendants are Texas residents.

II.     Factual Allegations

A.      Introduction

9.      Plaintiffs provide in the factual allegations sections below the general substance of certain factual allegations.  Plaintiffs do not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations. Rather, Plaintiffs intend that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiffs' allegations, and further demonstrate that Plaintiffs' claim(s) have facial plausibility.  Whenever Plaintiffs plead factual allegations "upon information and belief," Plaintiffs are pleading, in accordance with Federal Rule of Civil Procedure 11(b)(3), that the specified factual contentions have evidentiary support or in the alternative will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

B.      Gabriel Eduardo Olivas

10.     Gabriel grew up in Sylmar, California.  Gabriel and Selina met when they were teenagers, and had been together as a couple since not long after meeting.  They had been common-law married for years prior to Gabriel's death.  Gabriel and Selina moved to Arlington, Texas when Gabriel was approximately 22 years old, where they resided until Gabriel's death.

11.     Gabriel worked doing creative effects for movies when he and Selina lived in California.  This included things such as using fans for actors, to make it appear as if actors were in a windy situation, and using road cages for cars.  When Gabriel and Selina moved to Texas, Gabriel worked in t-shirt printing.

C.      Officer Guadarrama and Officer Jefferson Unreasonably Tase Mr. Olivas,
        Causing Him to Catch Fire, Suffer Horrific Burns, Linger, and Die

12.     On July 10, 2017, Mr. Olivas was at home, telling family members that he would kill himself, by lighting himself on fire after dousing himself with gasoline.  He did not threaten to harm his wife, his son, or anyone else in his home.  In fact, he never harmed his wife, his son, or anyone else on that day.  Rather, Mr. Olivas was distraught and seeking attention.  Mr. Olivas did not intend to commit suicide, and he would not have committed suicide.  Mr. Olivas never ignited a lighter or any other device to catch himself on fire.  Instead, Defendant police officers arrived at his home, Tased Mr. Olivas (knowing that he was drenched with gasoline), and caused Mr. Olivas to catch fire and die after lingering in excruciating pain for days.

13.     There is no doubt that all police officers at the scene of the incident leading to Mr. Olivas' death, at which he was Tased, were aware that Mr. Olivas was threatening to commit suicide.  Upon information and belief, they learned this information through communications with the Arlington Police Department before arriving at Mr. Olivas' home.  Further, even after Mr. Olivas was Tased and caught fire, as described below, Arlington Police Officer C. Pierce (#2827) signed a notification of emergency detention.  Officer Pierce wrote in part that Mr. Olivas had made several statements to family members about killing himself.  Officer Pierce also noted that Mr. Olivas poured gasoline at certain spots inside the home as well as all over himself, saying he was going to kill himself.  Therefore, Officer Pierce sought temporary admission of Mr. Olivas to

the Medical City Plano inpatient mental health facility on an emergency basis.  This request is authorized under Texas law.  Thus, all such officers knew that Mr. Olivas had not threatened to harm anyone other than himself, and he had not harmed anyone.

### 1.      Statements

14.      Arlington Police Officers provided statements about what occurred after Mr. Olivas was improperly and unreasonably Tased.  Relevant portions of relevant statements are provided below.

### a.      Officer Scott (#2835)

15.      Officer Scott provided a statement, entitled "supplemental narrative," regarding the incident.  Officer Scott wrote that, on July 10, 2017, at approximately 11:57 a.m., he, Corporal Ray, Officer Guadarrama, and Sergeant Jefferson were dispatched to Mr. Olivas' home.  The call text stated that the caller's father was threatening suicide.  The caller was Gabriel Anthony Olivas, and his father was Mr. Olivas.  The call text allegedly further indicated that Mr. Olivas was threatening to burn down the house and was pouring gasoline in the house.  However, there was no indication that Mr. Olivas was threatening to harm his wife, his son, or anyone else in the home, or that he had trapped and/or otherwise put any such persons in a position that they would be harmed if Mr. Olivas chose to kill himself.  Mr. Olivas did not threaten to harm his wife, son, or anyone else at the home, and he had not trapped, injured, harmed, or put anyone in his home in a position that such persons would be harmed or injured if Mr. Olivas actually chose to commit suicide.  However, Mr. Olivas would never have committed suicide.  Mr. Olivas did not commit suicide, and he did not light a lighter he was holding.  He caught fire solely as a result of officers Tasing him when they should not have done so.

16.     While driving to Mr. Olivas' home, police officers informed police dispatch to have Mr. Olivas' son and whoever else was in the house with Mr. Olivas to exit the house.  When officers arrived at the scene, it would have been reasonable for them to follow their own advice, and remove people other than Mr. Olivas from the home.  They should have removed everyone other than Mr. Olivas from the home rather than ultimately confronting and Tasing Mr. Olivas with family members in the house.  Officer Scott heard Officer Elliott (#3007) place himself onto the call for service.  Before Officer Scott's arrival, he asked dispatch where Mr. Olivas was located. Officer Scott was told that he was inside one of the bedrooms.

17.     Officer Scott indicates that he arrived at approximately 12:02 p.m., along with Corporal Ray.  Officer Scott noticed that there were already three police vehicles at Mr. Olivas' house.  Police officers from those vehicles were already presumably in Mr. Olivas' home.  As Officer Scott was pulling up to Mr. Olivas' residence, he heard officers "call for the channel." After parking, Officer Scott and Corporal Ray began to run toward the home.  Officer Scott saw an Hispanic female in the front yard waving at officers, and yelling, "Hurry up."  Officer Scott asked the female which way, and she said down the hallway to the first bedroom on the right.  This description of where Mr. Olivas was located shows how easy it would have been for officers inside to quickly remove family members from the house through the front door, before having to have any physical interaction with Mr. Olivas.  Ms. Ramirez is approximately 5 feet, 1 inch tall, and Gabriel Anthony Olivas is approximately 5 feet, 8 inches tall.

18.     Officer Scott and Corporal Ray entered the home and ran towards the bedroom. Corporal Ray then abruptly stopped, and Officer Scott bumped into him as a result.  Officer Scott never made it to the bedroom and was not able to see who was inside of the bedroom.  Corporal

Ray then informed Officer Scott that a man was on fire.  Officer Scott could then see smoke coming from the bedroom in which Mr. Olivas has been Tased.

### b.      Corporal Ray (#2573)

19.     Corporal Ray wrote a report, entitled "Supplemental Narrative."  He wrote that, on Monday, July 10, 2017, at 11:57 a.m., he was dispatched to Mr. Olivas' home regarding an alleged suicidal subject, high on methamphetamines, and who was pouring gasoline inside the home.  Corporal Ray indicated that, when he arrived, he was met by "frantic family members yelling for officers to hurry and help their father."   Mr. Olivas' son, Gabriel Anthony Olivas, yelled to Corporal Ray that, as soon as he entered the home, he should turn right, and he would find Mr. Olivas in the first room.  Once again, this description as to how to access the bedroom in which Mr. Olivas was located, and which was now on fire, showed how easy it would have been for Defendant police officers to have removed family members from the residence using the open front door (thereby avoided Tasing Mr. Olivas).  They could have then examined the situation from a better vantage point.  Corporal Ray entered the home and turned right.  As soon as he turned the corner, he observed Mr. Olivas, on fire, yelling.  The room was very dark by that point, and smoke was beginning to fill the room.

### c.      Officer Jeremias Guadarrama (#2514)

20.      Officer Guadarrama signed a typed statement after the incident involving Mr. Olivas.  He wrote that, on Monday, July 10, 2017, at approximately 12:00 p.m., he was dispatched to Mr. Olivas' residence in reference to a suicidal individual who had been believed to have doused his residence with gas.  However, after arriving at the residence, Officer Guadarrama learned that

the residence had not been doused with gas.  He was the first officer arriving at the scene, and he staged while awaiting back-up.

21.     Officer Guadarrama wrote that Sergeant Jefferson and Officer Elliott were the next officers to arrive at Mr. Olivas' home on July 10, 2017.  He wrote, "Sergeant Jefferson reminded us to use non-lethal on the suicidal person."  Officer Guadarrama noted that, as they walked toward Mr. Olivas' home, the front door was wide open.  Thus, there was no obstruction keeping officers from removing people other than Mr. Olivas from the home, through the front door.  They entered the residence, and Officer Guadarrama "very quickly detected the strong odor of gasoline inside the residence."  Thus, he, and every other officer arriving at the home prior to interaction with Mr. Olivas knew that using a Taser in such a situation, in an area in which gas and/or gas fumes was present, would probably start a fire.  After he walked further into Mr. Olivas' home, he heard loud discussion between a male and female in an east corner of Mr. Olivas' home.  When they walked further into the house, a female family member pointed officers into the east corner bedroom.  This was roughly the southeast corner of the home, or the front right corner.

22.     As the officers entered into that bedroom, Officer Guadarrama "knew that the suicidal male [Mr. Olivas] was inside the bedroom."  Further, "I was concerned that the suicidal male would ignite the bedroom on fire igniting himself and innocent victims, because I could smell the very strong odor of gasoline inside the bedroom."  Regardless, Officer Guadarrama did nothing to remove people from the home and extract them from what he perceived to be a dangerous situation.  Instead, as described below, he chose to leave such persons in the home, Tase Mr. Olivas, and catch Mr. Olivas and the home on fire as a result.

23.     Officer Guadarrama's statement omits important occurrences.  His statement indicates that Mr. Olivas immediately began pouring a red container full of liquid on top of his

heard with his left hand while holding in his right hand "some sort of lighting mechanism." He also wrote that "the female was in-between the suicidal individual and officers within arm's reach of both . . . ." However, he alleged, "[S]he would not leave the room after several commands." Officer Guadarrama should have grabbed the woman and removed her from the room. Instead, his allowing her to remain, and the ultimate Tasing of Mr. Olivas, was unreasonable.

24.     Officer Guadarrama, confusing the chronology of what occurred, writes that Officer Elliott then sprayed Mr. Olivas with OC spray. Officer Guadarrama saw Sergeant Jefferson remove his Taser and point it at Mr. Olivas. After Officer saw the red dot from Sergeant Jefferson's Taser on Mr. Olivas' chest, Officer Guadarrama also pulled his Taser and pointed it at Mr. Olivas. Sergeant Jefferson was the ranking officer, and Officer Guadarrama followed the lead of his ranking officer.

25.     Officer Guadarrama makes no mention in his statement about Officer Elliott clearly telling Officer Guadarrama and Sergeant Jefferson that, if they shot Mr. Olivas with the Taser, he would catch on fire. Regardless, Officer Guadarrama knew that, if he shot Mr. Olivas with a Taser, Mr. Olivas, and potentially the entire room (due to gas fumes), would catch fire. Officer Guadarrama admitted in his statement that Mr. Olivas was in close proximity at the time, and was further a "safe distance away from his family members." Officer Guadarrama further wrote something in the statement which was a blatant inconsistency, and which was not true. He wrote, "The female family member was right next to the suicidal male . . . ." He further falsely wrote, "I was afraid that if I fired my firearm a bullet from my service weapon could possibly strike the female family member due to the close proximity that she had next to the suicidal male." Mr. Olivas could not be a "safe distance away from his family members" and at the same time be right next to a female family member. In fact, the truth was that Mr. Olivas was not right next to either

his son or his wife – the only two family members in the room.  Instead, the three police officers, Mr. Olivas's wife, and Mr. Olivas's son were generally in line facing Mr. Olivas at the time police officers chose to Tase Mr. Olivas.  Neither Mr. Olivas's wife or son was in such proximity to Mr. Olivas, such that there would have been any risk of either being shot had Officer Guadarrama chosen to shoot at Mr. Olivas with his firearm.

26.    Officer Guadarrama wrote, "I instinctively fired my duty issued Taser striking the male in the torso area."  He also wrote that "moments later the individual was engulfed in flames." He noted that Mr. Olivas "then began to run around the room engulfing the room in flames."  None of this was a surprise to Officer Guadarrama.  Officer Guadarrama fired his Taser at Mr. Olivas even though Mr. Olivas never made any gesture toward family members or police officers that day.  Thus, he had visibly done nothing to threaten his family members or police officers.

27.    Further, Officer Guadarrama fails to mention that it appeared to everyone in the room that Mr. Olivas could not see as a result of being sprayed in his eyes with OC spray.  This had been made clear to people in the room, because Mr. Olivas had rubbed his hands over his eyes after being sprayed.

28.    The fact that Officer Guadarrama alleges that he "instinctively" fired his Taser at Mr. Olivas showed that he was not acting in a reasonable manner based upon his knowledge of what would occur after firing the Taser.  Upon information and belief, Officer Guadarrama had attended training during which he learned that the firing of a Taser in such situation was likely to cause Mr. Olivas, and potentially other areas in the room with gasoline fumes, to catch fire.  Officer Elliott had also told Officer Guadarrama prior to Taser deployment that Mr. Olivas would catch fire.  The result was Mr. Olivas' death.

29.     Officers, by shooting their Tasers at Mr. Olivas, also further endangered Mr. Olivas's wife and son.  Officers were unaware as to whether Mr. Olivas's wife and/or son had gas on them (thus increasing the likelihood that they would catch fire).  Further, neither Mr. Olivas's wife or son were injured or burned as a result of the Tasing and resulting fire.  This demonstrated that neither of them were close enough to Mr. Olivas to be in danger if Mr. Olivas had chosen to light himself on fire.  After the police officers started the fire, an officer fleeing the room in panic collided with Ms. Ramirez with such force so as to injure her knee.

### d.     Sergeant Ebony N. Jefferson (#2116)

30.     Sergeant Jefferson signed a written statement regarding the incident, on July 14, 2017, after having plenty of time to meet with his attorney.  Sergeant Jefferson wrote that he was on duty working as Operational Sergeant in the East District.  He then heard dispatch send officers to Mr. Olivas' home in reference to a suicidal person.  He also heard that the person had poured gasoline on himself and in a room.  Thus, he had not heard that anyone had poured gasoline throughout the house.  In fact, Mr. Olivas had not poured gasoline throughout the house.  Sergeant Jefferson was not far from the location, so he asked dispatch to show that he would be in route to the call.

31.     When Sergeant Jefferson arrived, he saw two other patrol vehicles staged near Mr. Olivas' home.  He then informed dispatch that he was on-scene.  Those officers were Officer Elliott and Officer Guadarrama.

32.     Sergeant Jefferson saw Officer Elliott and Officer Guadarrama run toward the open front door of Mr. Olivas' home.  Sergeant Jefferson exited his vehicle and ran to and joined the other officers at the door.

33.     Sergeant Jefferson noticed that Officer Guadarrama had his duty firearm drawn. Therefore, Sergeant Jefferson told Officer Elliott to draw "less lethal."  This was an instruction to Officer Elliott to draw his Taser.  After Officer Elliott pulled his Taser, Sergeant Jefferson pulled his Taser "as a second less lethal option."

34.     Sergeant Jefferson admitted that, "[a]s the Sergeant, [, he] wanted to be able immediately address whatever threat [he and other officers] were about to encounter."  Officer Guadarrama entered the residence, followed by Officer Elliot, followed by Sergeant Jefferson. Sergeant Jefferson determined that the noise was coming from a room down the hallway on the east side of the house from the front door.  When they entered the room with Mr. Olivas, Sergeant Jefferson smelled gas.  He noted that Officer Elliott had his Taser pointed in the direction of people in the room.  After making observations of several people in the room and hearing the commotion, Sergeant Jefferson alleges that he re-holstered his Taser and began to pull people away from Mr. Olivas and pushed them into the hallway.  He was allegedly unsuccessful.  Upon information and belief, Sergeant Jefferson would have been able to remove those people from the property, out the front door, if that were his goal.  Further, upon information and belief, this did not occur as Sergeant Jefferson alleged.

35.     Sergeant Jefferson would ultimately give a statement to Detective Gildon, who would investigate Mr. Olivas' death on behalf of the City of Arlington.  Sergeant Jefferson, in an assertion completely opposite of what he told Detective Gildon, wrote, "I un-holstered my [T]aser, turned it on and pointed it at the suspect."  It appears that Sergeant Jefferson, after realizing he did not tell the truth to a fellow law enforcement officer, and after having time to meet with his attorney, decided to change his story.  Sergeant Jefferson wrote that he then heard a Taser discharge from where Officer Guadarrama was standing.  Further, upon hearing that discharge, "The suicidal

suspect immediately catches on fire and I became startled by the flames and moved away from them." Sergeant Jefferson then, upon information and belief, falsely asserts that he unintentionally discharged his Taser.  Upon information and belief, Sergeant Jefferson pointed his Taser at Mr. Olivas and intentionally shot Mr. Olivas.  This was patently unreasonable.  Unreasonable force is unconstitutional force.

e.      Officer Caleb Elliott (#3007)

36.      Officer Caleb Elliott signed a statement related to the incident leading to Mr. Olivas' death.  In his statement, he indicated that, on July 10, 2017, at approximately 12:30 p.m., he was driving a marked patrol vehicle in full uniform.  He wrote that he overhead a suicide in progress call at Mr. Olivas' home, and that the call was announced on the radio.  He said the call text indicated that the caller's father was wanting to harm himself.  Upon information and belief, there was no call text indicating that Mr. Olivas wanted to harm anyone else.  Officer Elliott indicated that, since he was coming back to the East District from administrative markout at the main station, he waited until he was inside East District lines before sending the dispatcher a message informing her that he would be in route to the call.  He then received information over the radio that Mr. Olivas was pouring gasoline on himself.  Officer Elliott activated his overhead lights and siren and began to drive to Mr. Olivas' home.

37.      As Officer Elliott got close to Mr. Olivas' home, he heard Officer Guadarrama call out on the radio that he was staged near Mr. Olivas' home.  Officer Elliott turned off his siren when he was approximately 200 yards north of Carla Avenue on Allen Avenue.  He then saw Officer Guadarrama, who had parked on Mr. Olivas' street just off of Allen Avenue, begin to drive to Mr. Olivas' home.  Officer Elliott followed Officer Guadarrama and parked directly behind him (just west of Mr. Olivas' home).

38.     As Officer Elliott and Officer Guadarrama walked toward Mr. Olivas' home, Officer Elliott put on latex gloves due to information regarding gasoline having been poured onto Mr. Olivas.  Officer Guadarrama told Officer Elliott that, some time back, he and other officers had responded to the home and discovered a man who possibly could be the same subject in the current call and who Officer Guadarrama said was wanting suicide by cop at the time.  The assertion that Mr. Olivas wanted "suicide by cop" was false.  Mr. Olivas never wanted "suicide by cop" and/or to be killed by any police officer.  In fact, Mr. Olivas did not want to commit suicide, and he would not have committed suicide that day.  Upon information and belief, Officer Guadarrama made the statement to create in advance a defense for himself if anything were to go wrong inside the home.  Mr. Olivas needed help.  He did not need to be Tased and killed by police.

39.     At this point, Sergeant Jefferson arrived at the scene.  Sergeant Jefferson approached Officer Guadarrama and Officer Elliott in the front yard.  Sergeant Jefferson, being in charge of the scene, said to Officer Elliott, "Elliott, you take less lethal."  Officer Elliot understood the instruction, and un-holstered his Taser and held it by his side in his right hand.  However, shortly after unholstering his Taser, Officer Elliott realized what everyone at the scene realized as well – if Mr. Olivas "had actually poured gasoline on himself, applying a Taser was likely to ignite a fire."  Thus, consistent with Officer Elliott's Taser-use knowledge, he knew that Mr. Olivas would probably catch fire if someone used a Taser on him.  Sergeant Jefferson, who was in charge, and Officer Guadarrama, possessed the same knowledge.  They knew that, if they Tased Mr. Olivas after he had poured gasoline on himself, he would probably catch fire.  Thus, while Sergeant Jefferson referred to Officer Elliott's potential use of a Taser as "less lethal," he knew that it would likely be lethal if Mr. Olivas had poured gasoline on himself.

40.     Officer Elliott kept his Taser out and by his side as they entered Mr. Olivas' home, due to, at that moment, Officer Elliott not knowing for sure whether Mr. Olivas had actually poured gasoline onto himself or if, instead, Mr. Olivas' family had meant only that Mr. Olivas had been grabbing at a gasoline can in an attempt to pour gasoline on himself.  Officer Elliott's speculation would soon be remedied, and he, along with every other officer in the room with Mr. Olivas, would know with certainty that Mr. Olivas had in fact poured gasoline on himself.

41.     Officer Elliott continued his written statement.  He affirmed that he would use the Taser "only if [he] had sufficient reason to believe [Mr. Olivas] had not actually poured gasoline on himself."  Therefore he "kept it in [his] hand in case [he] immediately had cause to use it and knowledge that [Mr. Olivas] had not doused himself in gasoline."  Officer Elliott knew that he could not use excessive, unconstitutional force on Mr. Olivas by firing a Taser at him when he was doused with gasoline, even if a ranking officer instructed him to do otherwise.

42.     Officer Guadarrama entered the home before Officer Elliott, and Sergeant Jefferson was directly behind Officer Elliott.  Officer Elliott saw a female standing inside near the entrance to the home.  Thus, the female could have been easily removed from the home by the Defendant officers.  After he entered Mr. Olivas' home, Officer Elliott observed a puddle of some liquid on the floor to the right of the front door.

43.     Officer Elliott followed Officer Guadarrama into the bedroom in which Mr. Olivas was located.  The bedroom was directly east of the front door.  As soon as Officer Elliott entered the room, he could smell the odor of gasoline.  Upon information and belief, the Defendant officers also could smell the odor of gasoline in the air as they entered the room.  Thus, they all knew that Mr. Olivas would probably catch fire if he were Tased and covered with gasoline.

44.     Officer Elliott saw Mr. Olivas on the far south wall of the room, leaning against the wall.  Mr. Olivas was holding a red plastic gas can against his body, and it appeared to be a 2-gallon or 2.5-gallon can.  Officer Elliott said that he observed two or three family members attempting to pull the gas can away from Mr. Olivas.  However, there were only two family members in the room.  Mr. Olivas and the family members were yelling and screaming, but Officer Elliott could not make out any words.  Officer Guadarrama moved to the left side of the room, in front of a large piece of furniture.  Officer Elliott moved to the right side of the room in front of another piece of furniture which separated him from Officer Guadarrama.  Sergeant Jefferson then entered the room, standing at the end of the couch between Officer Guadarrama and Officer Elliott.

45.     Officer Elliott used his flashlight to illuminate Mr. Olivas.  He noted that Mr. Olivas' body appeared dry.  Thus, Officer Elliot believed that "Taser deployment may have been possible due to the lack of visible gasoline on his body."  Therefore, Officer Elliott activated his Taser and pointed it at Mr. Olivas.  At that time, family members moved behind the officers and stood closer to the room's doorway.  The Defendant officers should have taken that opportunity to physically remove those family members from the home and avoid what would occur.  Officer Elliott turned his head and shouted at the family, "Get out of here, now!"  Mr. Olivas's wife and son backed to the doorway, and then moved back into the room.  However, they then remained generally in line with the three police officers and not adjacent to Mr. Olivas.  Upon information and belief, Defendant officers did nothing to physically remove the family from the situation.  It would have been reasonable to do so at that time, and before any interaction with Mr. Olivas had occurred.

46.     At this point, Officer Elliott realized that, although Mr. Olivas' skin appeared dry, he could still have gasoline fumes on or around him.  Thus, if Tased, Mr. Olivas could be set on

fire.  Officer Elliott turned his head slightly, so that he could see Sergeant Jefferson and Officer Guadarrama.  He then shouted to Sergeant Jefferson and Officer Guadarrama, "If we Tase him, he is going to light on fire."  Upon information and belief, Sergeant Jefferson and Officer Guadarrama heard what Officer Elliott said.  Officer Elliott then holstered and turned off his Taser.

47.      It was abundantly clear to Officer Elliott that, if any one Tased Mr. Olivas, Mr. Olivas would catch fire.  Officer Elliott did not say he would likely catch fire, or would probably catch fire.  He said that he would catch fire.

48.      Thus, it was clear to all three officers in the room that, if Mr. Olivas was Tased, he would suffer significant burns and injury, and potentially death.  Officer Elliott had been with the City of Arlington Police Department for only approximately one year at that time, whereas Sergeant Jefferson had been with the Department over fourteen years, and Officer Guadarrama had been with the Department over nine years.  However, Officer Elliott acted at that time in a reasonable manner, stating his knowledge regarding Taser deployment.  Sergeant Jefferson and Officer Guadarrama had the same knowledge but chose to ignore it and instead act in an unreasonable, unconstitutional manner.

49.      Officer Elliott then unholstered his OC spray and shook it briefly, attempting to mix it thoroughly, before spraying Mr. Olivas in the face from approximately 6 feet away (for approximately 2 seconds).  According to Officer Elliot, as Officer Elliott shook his spray, Mr. Olivas stood up and poured gasoline over his head and onto his head.  However, Officer Elliott left out the fact that Mr. Olivas, after being sprayed in the face, could not see and was rubbing his eyes with his hand, and was not making any gestures or aggressive moves toward anyone.  Officer Elliott could see the gasoline running all the way down Mr. Olivas's torso and beginning to soak his pants.  Upon information and belief, other officers in the room also saw the same thing.  At

some point, Mr. Olivas began screaming "non-sense" and yelling that he was going to burn the place to the ground. However, by this time, Mr. Olivas had moved to a position near the middle of the far wall to the left corner, near the window. It was at this point he began to turn and face Officer Elliott. Officer Elliott, fearing that he would flood the room with OC spray fumes and begin to incapacitate himself and other officers, shut off the spray. Mr. Olivas was still blinded as a result of OC spray being sprayed into his eyes.

50.    The fact that Officer Elliott alleges that he was only 6 feet away from Mr. Olivas shows that Mr. Olivas could have easily been subdued by Officer Elliott, by Officer Elliott rushing and grabbing Mr. Olivas. Upon information and belief, other officers in the room could have done the same. Police officers often use what is referred to as the "21-Foot Rule" when attempting to defend themselves from excessive force allegations. This purported rule holds that, if a subject armed with a knife, club, or similar weapon is within 21 feet of an officer, a reasonable conclusion would be that the officer would be within a danger zone. According to the alleged rule, such a person would be able to close the distance and use the weapon before the officer could unholster and use his or her handgun. The purported rule further holds that the subject could close the 21 feet in about one-and-a-half seconds.

51.    Assuming without admitting that the 21-Foot Rule presents a truthful scenerio, then Mr. Olivas being only 6 feet away from Officer Elliott, and only a bit more than that away from other officers in the room, such officers could have closed the distance between themselves and Mr. Olivas in much less than a second and physically restrained him from doing anything to himself. However, instead of doing so, Defendant officers ultimately chose to Tase, and unfortunately kill, Mr. Olivas. They chose to do this knowing that there were others in the room

that they could have physically removed.   Thus, Defendant officers acted unreasonably and unconstitutionally.

52.     Notably, it was not until after this point that Officer Elliot noticed that Mr. Olivas had an object in the hand other than the hand with which he was holding the gasoline can.  Upon information and belief, other officers likewise had not noticed the object until that time.  Thus, any and all officers in the room could have and should have quickly physically subdued Mr. Olivas rather than stand at a distance and using OC spray and/or a Taser to attempt to subdue him.  It was unreasonable to think that gas alone, without some lighting device, would have been a danger keeping officers from quickly and physically subduing Mr. Olivas.

53.     Officer Elliott noticed the object in Mr. Olivas' hand when Mr. Olivas lowered the gasoline can with his left hand but kept his right hand raised.  Officer Elliott believed the object to be a lighter of some sort.   Officer Elliott realized that officers either had to find a way to incapacitate Mr. Olivas (which, upon information and belief, they could have already physically done quickly), or evacuate the home and formulate a plan to remove the subject.   The home evacuation should have been done immediately when officers arrived at the scene, but they chose to unreasonably engage in extended interaction with Mr. Olivas and ultimately cause his death.

54.     Officer Elliott observed Sergeant Jefferson pull his Taser out of its holster and point it at Mr. Olivas.  Officer Elliott then saw two red lasers trained on Mr. Olivas' chest.  This indicated to Officer Elliott that there were two Tasers pointed at Mr. Olivas.  Officer Elliott's Taser was still holstered, and turned off.  Shockingly, Officer Elliott then heard a sudden pop, indicating to him that a Taser had been fired. "[T]he subject was suddenly engulfed in flame."  The Tasing of Mr. Olivas caused him to catch fire and ultimately die.  Both Tasings contributed to, were producing causes of, and were proximate causes of Mr. Olivas catching fire and dying.  South and east walls

in the room quickly started to catch fire, and Officer Elliott could feel immense heat.  The family was still behind Officer Elliott at that time, which once again showed that Defendant officers could have quickly forced family members to exit the home through the relatively close front door.  This was, unfortunately, demonstrated after Mr. Olivas caught fire.  Officer Elliott "began to push and shove the family out of the room, saying, 'Get out, get out now!'"  Sergeant Jefferson and Officer Guadarrama were closer at that point in time to Mr. Olivas than was Officer Elliott.  Officer Elliott ultimately ran out of the home to make sure all the family members were outside, and he observed a family member grabbing a water hose to try to put out the fire from the outside of the home.  At one point, Officer Elliott went back into the home and saw Mr. Olivas laying on the ground, kicking and flailing as he laid there, on fire, and in horrific pain.

### 2.    Mr. Olivas' Medical Condition at the Scene

55.    American Medical Response ("AMR") responded to the scene to medically assist Mr. Olivas.  Records indicate that AMR received a call at 11:55 a.m. and arrived at Mr. Olivas' side at 12:13 p.m.  Mr. Olivas' pain was listed in records as being 10 on a scale of 10 at 12:15 p.m.  The listed chief complaint was "burn."

56.    Records indicate that Mr. Olivas was found with what appeared to be a full-body burn, having mostly second and third degree burns with some first degree burns.  Mr. Olivas could not open his eyes, and his clothes were burned off with the exception of a portion of his pants and socks.  Mr. Olivas was yelling for help.  His skin was ashen, black, and red.  Mr. Olivas appeared to have Taser barbs in his chest.  The barbs were removed.

57.    Mr. Olivas was transferred to the hospital by ambulance.  He did not say anything during transport about what occurred, or how he became engulfed in flames.  Mr. Olivas was crying in pain and demanding morphine.  Morphine was administered to Mr. Olivas on the way to

the hospital, in three doses of 5 milligrams each.  Even after administration of that medication, Mr. Olivas was described as fully alert and screaming.  Mr. Olivas was unable to sign medical records due to his injuries.  Records indicate that an EMT was told at the hospital, by someone with the Arlington Police Department, that Mr. Olivas poured gasoline all over himself and lit himself on file to attempt suicide.  The allegation that Mr. Olivas lit himself on fire is false, and it was made to deflect liability from Defendants.

### 3.     Autopsy

58.     Stephanie S. Burt, M.D., Assistant County Medical Examiner with Collin County Office of the Medical Examiner, conducted an autopsy of Mr. Olivas.  The report indicates that Mr. Olivas was 5 feet, 8 inches tall and weighed 200 pounds.  Dr. Burt found that Mr. Olivas had suffered thermal burns and smoke inhalation.  She further found extensive partial to full-thickness burns with debridement and skin grafts over eighty-five percent (85%) of Mr. Olivas' body.  She noted a history of inhalation injury with soot in his airway.  Based upon the autopsy and history available to Dr. Burt, it was her opinion that Mr. Olivas died as the result of thermal burns and smoke inhalation.  Dr. Burt did not reach any opinion as to what caused the fire which ultimately caused Mr. Olivas' death.  However, the fire was caused by Taser deployment described in this pleading.

### D.     Death Investigation

#### 1.     Taser Analysis by Axon Enterprise, Inc. (f/k/a Taser International, Inc.)

59.     Axon Enterprise, Inc., formally known as Taser International, Inc. ("Axon"), was asked to analyze Taser evidence distroyed in the fire to determine if the cartridge in each relevant Taser had deployed on July 10, 2017.  Axon received, on July 26, 2017, two boxes.  One box was labeled "RHA 9," and the other box was labeled "RHA 10."  Axon provided a report, dated

September 7, 2017, regarding its analysis.  Axon noted that the X26 Taser was first produced in 2004 and ultimately retired from production in December 2015. The X26 is activated by pulling the trigger when the device is armed.  If the trigger is pulled and released, the X26 will be active for 5 seconds.

60.     The report also indicated that the Taser X26P device is a single-cartridge device in the Axon Smart CEW line which was first available in January 2013.  It was designed significantly on the X26 platform first available in April 2012, which was in turn was significantly designed on the Taser X3 platform first avaialable in July 2009.  The X26P device also had an ambidextrous safety switch.  When the switch is in the up position, the weapon is armed and ready to activate. The X26P is in safe mode when the safety switch is in the down position.

61.     The X26 and X26P deploy Taser-brand standard cartridges.  Cartridges are offered in distances of 15 feet, 21 feet, and 25 feet.  A 35-foot cartridge was offered until April 2012. When a Taser cartridge is deployed, 20-to-30 AFID tags are disbursed.  The AFIDs are printed with the serial number of the cartridge from which they are deployed.

62.     Axon analyzed evidence it received from Arlington.  As to evidence labeled RHA 9 (Item 1), results showed that the cartridge's gas capsule was punctured, and the wire bundle was not present inside the cartridge.  This indicated that the cartridge had been deployed.  Axon could not determine whether the cartridge was deployed as a result of a trigger pull or as a result of heat (from the fire) exceeding 536 degrees.

63.     As to evidence labeled RHA 9 (Item 2) Axon indicated that the cartridge had not been deployed.  As to evidence labeled RHA 10, Axon determiend that the cartridge had been deployed.  Axon was uncertain as to whether the cartridge was deployed as a result of a trigger pull or due to heat exceeding 536 degrees.

2.      Scene Investigators

64.      On Monday, July 10, 2017, at approximately 1:20 p.m., Arlington Police Department Crime Scene Investigator S. Ozuna (#2366) was notified by a crime scene sergeant of the incident involving Mr. Olivas.  His report begins with the incorrect statement that Crime Scene Investigator Ozuna ("CSI Ozuna") was notified of the incident on "Monday, July 7, 2017 at approximately 13:20 hours."  Upon information and belief, that was a typographical error.  Instead, upon information and belief, CSI Ozuna arrived at Mr. Olivas' home on July 10, 2017 at approximately 1:49 p.m.

65.      CSI Ozuna noted that the weather was clear and hot.  He observed multiple fire trucks and police vehicles arround Mr. Olivas' home.  He also noted that Mr. Olivas' home was a two-story house, with the front door oriented to the south.  He indicated that the front yard was on the east side of the home.  CSI Ozuna saw fire damage from the outside of the home involving the downstairs southeast bedroom.  CSI Ozuna was led to that bedroom from the front door by, upon information and belief, fire investigators.  Electricity to the home had been terminated.  CSI Ozuna provided in his report a detailed description of what he observed at the scene, including significant fire damage to Mr. Olivas' home.

66.      Fire Investigator R. Alcantar (#689) also responded to the house fire on July 10, 2017.  He noted that the most severe fire damage was located on the southeast corner of the house.  There was heavy fire, smoke, and heat damage visible in the bedroom in which Mr. Olivas was Tased and caught fire.  The mattress in the room had fire damage, such that mattress springs were visible.  There was also a section on the top of a dresser that had been burned away.  According to his report, "All windows in the bedroom were broken."

3.     Arlington Police Department Homicide Unit

67.     Detective Grant Gildon (#2261) conducted an investigation regarding Mr. Olivas' death, and he drafted reports including a 137-page report.  Information in this section of the pleading was obtained from that 137-page report.

68.     On the very day that Mr. Olivas was shot with Tasers and engulfed in flames, Sergeant Jefferson, Officer Guadarrama, and Officer Elliot were already meeting with an attorney representing them from the Combined Law Enforcement Association of Texas ("CLEAT").  "They stated prior to [Detective Gildon's] arrival they were told Officer Guadarrama would not be giving a statement to [Detective Gildon] on [that] date and that it was undetermined if the others would be providing statements."  Thus, the Defendant officers were able to meet with an attorney, while Mr. Olivas was receiving emergency medical treatment at the hospital, even before giving statements as to what occurred.  While at Medical City of Arlington on that date, which is where Detective Gildon learned information in the preceding sentence, he also learned that four Taser probes were recoverd from Mr. Olivas and his clothing.  This indicated that two Taser deployments had occurred.

69.     Attorney Terry Daffron, with CLEAT, was the attorney who responded to the hosptial to represent Sergeant Jefferson, Officer Guadarrama, and Officer Elliott.  Detective Gildon informed Ms. Daffron of the status of the case, and further that he wanted to speak to the three officers about what occurred.  Ms. Daffron asked if there was anything in particular about which Detective Gildon wanted to ask during interviews.  Thus, upon information and belief, Defendant officers' attorney was able to learn a bit about what Detective Gildon would ask – even before he asked it.  Further, upon information and belief, she was then able to communicate this information to Defendant officers.

70.     On July 10, 2017, Detective Gildon met with Sergeant Jefferson at Medical City of Arlington.  Also present were Sergeant Jefferson's attorney, Ms. Daffron, as well as Sergeant Jones, Detective Griesbach, Sergeant Coggeshall, and Lieutenant Harris.  Sergeant Jefferson said that he told Officer Elliott before entering Mr. Olivas' house that Officer Elliott would be the designated officer for the less-leathal option.  This indicated that Sergeant Jefferson had delegated to Officer Elliott the decision to use a Taser (if needed and reasonable).

71.     Sergeant Jefferson "described experiencing the strong odor of gasoline throughout the residence."  "He also falsely told the detective that he "Pulled his Taser out but didn't point it at the Decedent."  He also falsely represented "he didn't fire his Taser at any point during the incident."  However, Sergeant Jefferson was quick to blame Officer Guadarrama for firing his Taser and striking Mr. Olivas.  Sergeant Jefferson falsely told the investigator that he dropped his Taser onto the floor.  He did admit that Officer Elliott, who had been the designated person to determine whether Taser use was appropriate, did not fire his Taser.

72.     Upon information and belief, Arlington did not terminate Sergeant Jefferson as a result of his making false material statements to an investigator.  Further, upon information and belief, Arlington did not seek prosecution of Sergeant Jefferson as a result of such false statements made to a law enforcement officer.

73.     Sergeant Jefferson admitted that, after Taser deployment, Mr. Olivas and multiple items in the room caught fire.  This showed that Taser use can cause gas fumes alone to ignite.

74.     Detective Gildon also interviewed Officer Elliott at the hospital.  Officer Elliott told Detective Gildon that, when holstering his Taser after entering the residence, as described elsewhere in this pleading, he said out loud that they couldn't Tase Mr. Olivas.  Officer Elliot also said that he saw two separate red dots moving around on Mr. Olivas' chest, and that he believed

those dots to be dots from Tasers.  He also said that, upon hearing the Taser discharge, Mr. Olivas and the room became engulfed in flames.  After the interview, Detective Gildon met with Ms. Daffron and scheduled to meet with her and her client-officers two days later to answer questions and provide further details.

75.     Detective Gildon noted that Officer Elliott was in possession of both of his Taser cartridges.  He also noted that Officer Guadarrama had one Taser cartridge loaded into his Taser. A second Taser cartridge was in his bag inside his patrol vehicle.  Detective Gildon seized the cartridge inside the patrol vehicle.

76.     Sergeant Jefferson told Detective Gildon that both of his Taser cartridges were attached to his Taser.  Upon information and belief, this was a further false representation made by Sergeant Jefferson to a law enforcement officer.  Detective Gildon was told that both Officer Guadarrama and Sergeant Jefferson dropped their Tasers inside of Mr. Olivas' residence when the fire started.

77.     Detective Gildon obtained Arlington training records for Officer Elliott and the Defendant officers.  Records indicated that they all completed electronic control weapon (Taser) training in 2017, and that they were certified and approved to carry and operate Tasers as of July 10, 2017.  Sergeant Jefferson completed his annual Taser training on February 5, 2017, Officer Guadarrama completed his annual training on February 28, 2017, and Officer Elliott completed his annual training on June 3, 2017.

78.     On July 12, 2017, Detective Gildon interviewed Sergeant Jefferson again.  The interview occurred at the Arlington Police Department.  Sergeant Jefferson's attorney, Ms. Daffron, was present.  Sergeant Jones and Detective Griesbach were also present.

79.     Sergeant Jefferson admitted that he instructed Officer Elliott to be prepared with "less lethal coverage."  This meant that Officer Elliott was the designated officer for any Taser use.  Sergeant Jefferson also admitted that, as officers entered the residence, he could smell an odor of what appeared to be gasoline.

80.     Sergeant Jefferson, still weaving a tale of alleged non-involvment in Tasing Mr. Olivas, said that he pulled his Taser out at one point but then decided to re-holster it.  This is clearly untrue, because Sergeant Jefferson shot his Taser at Mr. Olivas.  Sergeant Jefferson also admitted that, as he entered the residence, he thought a Taser could possibly be used to control Mr. Olivas.  Sergeant Jefferson admitted that, at the moment he saw Officer Guadarrama pull his Taser, he began pulling his Taser from his holster.  Detective Gildon asked Sergeant Jefferson whether he pointed his Taser at Mr. Olivas.  "He stated he did not."  This was yet another false statement made by Sergeant Jefferson to a law enforcement officer.  Detective Gildon continued:

> He said as he was drawing his [T]aser Officer Guadarrama fired his [T]aser, which caused Sgt. Jefferson to flinch.  I then observed Sgt. Jefferson demonstrate how he flinched with the [T]aser in his right hand.  Sgt. Jefferson stated the Decedent then became engulfed in flames, so he dropped his [T]aser on the ground.  He stated he didn't believe he fired his [T]aser.

Thus, Sergeant Jefferson continued in his false narrative, making material misrepresentations to a law enforcement officer investigating Mr. Olivas' death.  Upon information and belief, Arlington did not terminate Sergeant Jefferson from his employment as a police officer and did not seek prosecution of him for the making of such false statements.  This was some evidence of Arlington's existing policy that the use of a Taser on suicidal subjects covered with gas was appropriate.

81.     Detective Gildon pushed Sergeant Jefferson about Sergeant Jefferson's false representation:

> I began asking Sgt. Jefferson if he fired his [T]aser while in the bedroom addressing the Decedent.  He stated he did not discharge his [T]aser.  I informed Sgt. Jefferson

that a total of four [T]aser probes were removed from the Decedent, which would indicate two separate [T]aser discharges occurred.  Upon hearing this, he immediately stated that if two [T]asers were discharged then he had to of [sic] fired his [T]aser.  He stated he knew Officer Elliott didn't fire a [T]aser because his [T]aser was holstered at the time.

Thus, once Detective Gildon convinced Sergeant Jefferson that Detective Gildon could prove with physical evidence that Sergeant Jefferson filed his Taser at Mr. Olivas, Sergeant Jefferson finally told the truth.

82.     Detective Gildon also interviewed Officer Elliott again.  The interview occurred on July 12, 2017 at the Arlington Police Department.  Officer Elliott once again reiterated that, due to the presence of gasoline, he holstered his Taser.  Detective Gildon wrote, "He holstered the [T]aser and stated to the other officers, 'If we [T]ase him, he's going to light on fire.'"  Thus, Officer Elliott stated information which Defendant police officers already knew – Tasing Mr. Olivas was certain to result in him catching fire.  Tasing Mr. Olivas in the situation in which he was Tased was patently unreasonable.

### E.     Defendant Officers' Experience and Training

#### 1.     2017 Taser Training

83.     As indicated elsewhere in this pleading, Sergeant Jefferson, Officer Guadarrama, and Officer Elliott received Taser update training in year 2017 before Mr. Olivas was Tased.  Arlington's training did not result in those officers receiving TCOLE credit.  They only received in-house Arlington Police Department training credit.  Upon information and belief, this was because Arlington's training did not meet standards high enough for TCOLE credit.

84.     These officers were reminded of what they already knew regarding use of a Taser electronic control weapon in a situation in which flammable substances and/or vapors are present.

A Taser should not be used.  Upon information and belief, each officer reviewed the following page and/or reviewed it as a slide in the 2017 training seminar:



Therefore, when Sergeant Jefferson and Office Guadarrama chose to shoot their Tasers at Mr. Olivas, they knew that he would catch fire.  The concept was not new to them but one they had learned years before.  They were also reminded of this concept just a few months before Tasing Mr. Olivas in year 2017.

85.     Notably, the flammability notice provided by Arlington to its police officers, during annual Taser training, did not prohibit use of a Taser in such a situation.  Therefore, Arlington policy allowed officers, such as Defendant officers, to Tase someone such as Mr. Olivas, even

when the person was doused in gasoline.  This policy was a moving force behind, caused, and was a proximate cause of Mr. Olivas' injuries, damages, and death.

### 2.    Texas Commission on Law Enforcement Records

86.    The Texas Commission on Law Enforcement (TCOLE) keeps records of training completed by, and the work history of, peace officers and jailers in Texas.  TCOLE records indicate that Defendant officers, as a result of their experience and law enforcement–related education, knew that what they did with regard with Mr. Olivas violated Mr. Olivas' constitutional rights.

87.    TCOLE records indicate the following service history for Officer Elliott:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Peace Officer (Full-time) | Arlington Police Department | Peace Officer License | 07/25/16 | |

88.    TCOLE records indicate that Officer Elliott received the following training and/or education, through which he should have obtained sufficient knowledge to know that any failure to act appropriately with regard to Mr. Olivas would have been unreasonable, deliberately indifferent, and a constitutional violation:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3722 | Peace Officer Field Training | 12/04/16 | 160 | Arlington Police Academy |
| 2040 | Defensive Tactics | 08/08/16 | 8 | Arlington Police Academy |
| 101 | Addendum Basic Peace Officer | 07/29/16 | 354 | Arlington Police Academy |
| 1000643 | Basic Peace Officer Course (643) | 06/17/16 | 643 | Arlington Police Academy |

89.     TCOLE records indicate the following service history for Officer Guadarrama:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Peace Officer | Arlington Police Department | Peace Officer License | 02/25/08 | 01/10/19 |
| Jailer | Parker County Sheriff's Office | Temporary Jailer License | 12/26/07 | 02/14/08 |
| Jailer | Tarrant County Sheriff's Office | Temporary Jailer License | 08/22/05 | 09/08/05 |

90.     TCOLE records indicate that Officer Guadarrama received the following training and/or education, through which he should have obtained sufficient knowledge to know that his failure to act appropriately with regard to Mr. Olivas was unreasonable, deliberately indifferent, and a constitutional violation:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 2040 | Defensive Tactics | 06/07/17 | 8 | Arlington Police Academy |
| 2040 | Defensive Tactics | 07/09/15 | 8 | Arlington Police Academy |
| 2040 | Defensive Tactics | 08/18/14 | 8 | Arlington Police Academy |
| 3344 | Less Lethal Electronic Control Device Training | 01/21/14 | 4 | Arlington Police Academy |
| 2040 | Defensive Tactics | 08/19/13 | 8 | Arlington Police Academy |
| 2108 | Arrest, Search, and Seizure (Intermediate) | 05/30/13 | 24 | Arlington Police Academy |
| 3340 | Crowd Control | 05/22/13 | 8 | Arlington Police Academy |
| 3340 | Crowd Control | 04/30/13 | 8 | Arlington Police Academy |

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3344 | Less Lethal Electronic Control Device Training | 01/31/13 | 4 | Arlington Police Academy |
| 3344 | Less Lethal Electronic Control Device training | 11/30/12 | 4 | Arlington Police Academy |
| 2040 | Defensive Tactics | 06/06/12 | 8 | Arlington Police Academy |
| 2053 | Baton (all) | 12/13/11 | 8 | Arlington Police Academy |
| 2107 | Use of Force (Intermediate) | 11/15/11 | 16 | Arlington Police Academy |
| 2040 | Defensive Tactics | 08/03/11 | 8 | Arlington Police Academy |
| 3344 | Less Lethal Electronic Control Device Training | 12/08/10 | 8 | Arlington Police Academy |
| 3340 | Crowd Control | 10/20/10 | 8 | Arlington Police Academy |
| 2040 | Defensive Tactics | 05/12/10 | 5 | Arlington Police Academy |
| 2040 | Defensive Tactics | 05/12/10 | 5 | Arlington Police Academy |
| 2040 | Defensive Tactics | 03/31/09 | 5 | Arlington Police Academy |
| 3722 | Peace Officer Field Training | 12/15/08 | 160 | Arlington Police Academy |
| 101 | Addendum Basic Peace Officer | 07/14/08 | 422 | Arlington Police Academy |
| 1000 | Basic Peace Officer | 07/11/08 | 618 | Arlington Police Academy |

91.     TCOLE records indicate the following service history for Sergeant Jefferson

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Peace Officer | Arlington Police Department | Peace Officer License | 03/03/2003 | |

92.     TCOLE records indicate that Sergeant Jefferson received the following training and/or education, through which he should have obtained sufficient knowledge to know that his failure to act appropriately with regard to Mr. Olivas would have been unreasonable, deliberately indifferent, and a constitutional violation:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 2040 | Defensive Tactics | 06/24/15 | 8 | Arlington Police Academy |
| 3009 | Supervision (other than TCOLE 3701, 3710, 3711, | 03/27/15 | 8 | Arlington Police Academy |
| 3009 | Supervision (other than TCOLE 3701, 3710, 3711, | 03/26/15 | 8 | Arlington Police Academy |
| 3009 | Supervision (other than TCOLE 3701, 3710, 3711, | 03/25/15 | 5 | Arlington Police Academy |
| 3009 | Supervision (other than TCOLE 3701, 3710, 3711, | 03/25/15 | 3 | Arlington Police Academy |
| 3009 | Supervision (other than TCOLE 3701, 3710, 3711, | 03/24/15 | 4 | Arlington Police Academy |
| 3009 | Supervision (other than TCOLE 3701, 3710, 3711, | 03/24/15 | 4 | Arlington Police Academy |
| 2096 | Arrest, Search & Seizure (Non-Intermediate Core Co | 11/20/14 | 16 | Arlington Police Academy |
| 2040 | Defensive Tactics | 09/16/14 | 8 | Arlington Police Academy |
| 2108 | Arrest, Search, and Seizure (Intermediate) | 07/31/14 | 24 | Arlington Police Academy |

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3737 | New Supervisor's Course | 01/31/14 | 56 | Institute for Law Enforcement Administration |
| 3700 | Management/ Supervision | 01/31/14 | 64 | Institute for Law Enforcement Administration |
| 3344 | Less Lethal Electronic Control Device Training | 01/28/14 | 4 | Arlington Police Academy |
| 2040 | Defensive Tactics | 11/07/13 | 8 | Arlington Police Academy |
| 3340 | Crowd Control | 05/22/13 | 8 | Arlington Police Academy |
| 3340 | Crowd Control | 04/30/13 | 8 | Arlington Police Academy |
| 3344 | Less Lethal Electronic Control Device Training | 02/28/13 | 4 | Arlington Police Academy |
| 3344 | Less lethal Electronic Control Device Training | 08/31/12 | 4 | Arlington Police Academy |
| 2040 | Defensive Tactics | 06/06/12 | 8 | Arlington Police Academy |
| 2107 | Use of Force (Intermediate) | 11/15/11 | 16 | Arlington Police Academy |
| 2040 | Defensive Tactics | 06/28/11 | 8 | Arlington Police Academy |
| 2040 | Defensive Tactics | 06/21/11 | 24 | Arlington Police Academy |
| 2056 | Toxic Chem/ Radioactive Materials | 12/15/10 | 8 | Arlington Police Academy |
| 3344 | Less Lethal Electronic Control Device Training | 12/08/10 | 8 | Arlington Police Academy |
| 3340 | Crowd Control | 11/11/10 | 8 | Arlington Police Academy |
| 3340 | Crowd Control | 11/04/10 | 24 | Arlington Police Academy |
| 3343 | Less Lethal Chemical Weapons Training (OC, Mace . . . ) | 07/20/10 | 8 | Arlington Police Academy |

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 2108 | Arrest, Search, and Seizure (Intermediate) | 07/15/10 | 24 | Arlington Police Academy |
| 2040 | Defensive Tactics | 05/14/10 | 5 | Arlington Police Academy |
| 3340 | Crowd Control | 04/28/10 | 24 | Arlington Police Academy |
| 2040 | Defensive Tactics | 03/03/09 | 5 | Arlington Police Academy |
| 2040 | Defensive Tactics | 09/23/08 | 16 | Arlington Police Academy |
| 55037 | Field Training Officer | 06/18/07 | 40 | Arlington Police Academy |
| 1000 | Basic Peace Officer | 03/03/03 | 576 | Arlington Police Academy |

Officer Elliott, who had much less training and experience than Sergeant Jefferson and Officer Guadarrama, chose the correct course of action regarding use of his Taser – keep it holstered.

### F.      Defendant Police Officers Acted in an Unreasonable, Unconstitutional Manner

93.      As alleged in this pleading, the Defendant police officers acted in a patently unreasonable manner when Tasing, and ultimately killing, Mr. Olivas.  Further, as alleged in this pleading, Defendant police officers acted in an unconstitutional, unreasonable manner when choosing not to evacuate other people from the residence but instead Tasing Mr. Olivas with such people present.

94.      In the alternative, or in addition, Defendant police officers should have effectively contained the residence by establishing a perimeter and requesting Arlington Police Department Special Weapons and Tactics (SWAT) and the Arlington Police Department Crisis Negotiation/Intervention Team to respond to the location.  A crisis negotiation/intervention team advises patrol officers on psychiatric issues that arise in the course of their law enforcement duties and assists in transportation and processing of individuals deemed to need inpatient psychiatric

treatment.  If Mr. Olivas barricaded himself in the home and refused to exit, utilization of SWAT would have been a safer alternative.  SWAT is equipped with special training, equipment, and tools, such as ballistic shields, chemical agents, Saber Red 16-ounce Stream MK-9 or a similar high-volume Oleoresin Capsicum ("OC") Streamer, less-than-lethal launchers/projectiles, ballistic/tactical gear, ballistic helmets, and armored rescue/recovery vehicles.  Handling barricaded subjects, if such would be the case with Mr. Olivas after evacuation of the home, requires special tools and expertise.  This comes from specialized training of officers.  The SWAT team would have been equipped and trained to resolve any barricaded subject situation.

95.     In addition, or in the alternative, the City of Arlington, through the Arlington Police Department, failed to properly train and certify Sergeant Jefferson according to TCOLE records. TCOLE records indicate that his last documented electronic control device/Taser training was on January 28, 2014.  Moreover, TCOLE records indicate that the last certified training of and for Officer Guadarrama, for electronic control device/Taser, was on January 21, 2014.  It appears that the City of Arlington only gave internal credit for other purported Taser training for those police officers.  Upon information and belief, the City of Arlington did so because the training was not up to standards required for training to be reported to TCOLE.  Thus, Arlington's failure to appropriately train the Defendant police officers was a moving force behind and proximately caused Mr. Olivas' death and all other damages asserted herein.

G.     City of Arlington's *Monell* Liability

96.     Arlington is liable for all damages referenced and asserted in this pleading pursuant to *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978) and its progeny.  Such liability arises due to the action and/or inaction of the chief policymaker for Arlington regarding police duties. The chief policymaker was the police chief at all relevant times, or the chief policymaker for the

City had delegated such chief policymaking authority to the police chief. Regardless, Fifth Circuit precedent is clear that Plaintiffs need not identify the specific chief policymaker at this stage of this case. Arlington's action and inaction referenced in this pleading, and its policies, practices, and/or customs, were moving forces behind, resulted in, were producing causes of, and were proximate causes of referenced constitutional violations and damages (including Mr. Olivas' death).

1.   City of Arlington's Policy Regarding Escalation in Force was a Moving Force Behind and Proximately Caused Mr. Olivas' Death

97.   The Arlington Police Department had in place, on July 10, 2017, an escalation of force policy. Upon information and belief, that policy read:

**Escalation.** Under normal circumstances, only the methods or instrumentalities listed below may be used to apply force. These methods are listed in ascending order from the least severe to the most extreme:

- Employee/employee **presence**: uniform, badge, patrol car, physical bearing;
- Verbal **direction**: verbal communication, negotiation skills;
- Passive **guidance/control**: hands-on escorting, picking up body weight, pushing-pulling gently;
- **Oleoresin-Capsicum** spray;
- **Electronic Control Device**;
- **Empty hand control**: soft (fingertip pressure applied to pressure points) or hard (striking motorpoints with hands/feet);
- **Intermediate weapons**: soft/(wrist locks using impact weapon) or hard (striking motorpoints with impact weapon);
- **Vascular Neck Restraint** and;
- Approved **firearm** and ammunition.

(Emphasis in original).

98.   Arlington decided that the least severe use of force was police officer presence, while the greatest use of force was use of a firearm. Arlington described the use of force continuum being listed "from the least severe to the most extreme." Thus, Arlington educated its police officers that they should apply that continuum when dealing with people such as Mr. Olivas.

99.     There are at least two issues with the use-of-force continuum, and its application, which were moving forces behind and proximately caused Mr. Olivas' death.  First, the use-of-force continuum indicates that Arlington police officers should use their electronic control devices (Tasers) before they should attempt to use soft hand techniques, which could simply be fingertip pressure applied to pressure points, or in the alternative hard-hand techniques.  The continuum also indicates that an officer should use his or her Taser before using intermediate weapons, such as hard impact weapons.  However, it is undisputed that a Taser can cause death in more situations than would use of soft hand techniques or impact weapons applied to certain portions of a person's body.  Thus, Arlington educated Defendant police officers to use their Tasers before using physical force with Mr. Olivas.  As shown elsewhere in this pleading, physical force is what should have been used with Mr. Olivas, if even necessary, after removal of other people from the house.

100.    Second, the use-of-force continuum contains no adjustment for and/or mention of a situation like that involving Mr. Olivas.  The continuum does not address the presence of gas and/or flammable fumes.  Thus, when Defendant officers chose to apply Arlington use-of-force policy, they would be required to apply it as written and not take into account the fact that Mr. Olivas would catch fire if a Taser were used against him.  This likewise was a moving force behind, caused, and proximately caused Mr. Olivas' injuries and death.

101.    Interestingly, when Arlington police policies were obtained pursuant to a Public Information Act request before suit was filed, Arlington chose to redact, and thus hide, what it considered to be examples of appropriate Taser use:

b. **Examples of appropriate ECW use** (Revised 12-18-06) (Revised 01-27-10):



(Redactions in original).

Upon information and belief, Arlington chose to redact these examples because they would show that its use of force policy, as ultimately applied to Mr. Olivas' situation, was unreasonable.

> **2.** City of Arlington's Policy, Practice, and/or Custom of Allowing Officers to Use a Taser Against a Person Doused with Gasoline was a Moving Force Behind and Proximately Caused Mr. Olivas' Death

102.   As noted above, City of Arlington did not prohibit a police officer from using a Taser on a person who had been doused with gasoline.  Instead, the City left the decision to the discretion of a police officer.  This is an unreasonably policy, and it was implemented, upon information and belief, knowing the certain effects it would have once a police officer Tased a person doused with gasoline.  The policy, practice, and/or custom was a moving force behind and proximately caused Mr. Olivas' death.

> **3.** City of Arlington's Policy, Practice, and/or Custom of Continuing to Employ Officer Guadarrama After Numerous Reprimands was a Moving Force Behind and Proximately Caused Mr. Olivas' Death

103.   City of Arlington's policy, practice, and/or custom of continuing to employ Officer Guadarrama, after he had received numerous reprimands and counseling regarding his official

duties, was a moving force behind and caused Mr. Olivas' death.  Before Officer Guadarrama's

unfortunate interaction with Mr. Olivas, on July 10, 2017, he had received numerous counseling

reports and written reprimands from the Arlington Police Department.  As a result, he should have

been terminated long before being in the bedroom with Mr. Olivas, armed with a Taser and other

weapons.  The following table lists such reprimands and counseling reports occurring before July

10, 2017:

| Date | Result | Rule/Regulation | Description |
|------|--------|-----------------|-------------|
| 04/08/2010 | Counseling Report | APDGO 402.02.A | Obedience to Laws and Regulations 2010-SD-0025 |
| 09/12/2010 | Written Reprimand | COAPP 201.07.A | Unauthorized Absence 2010-SWRI-0004 |
| 10/31/2010 | Counseling Report | COAPP 201.00./C | Courtesy 2010-SD-0085 |
| 10/10/2013 | Written Reprimand | APDGO 403.02.A.1 | Probable Cause Arrest 2013-SWRI-0005 |
| 01/12/2015 | Counseling Report | COAPP 202.02.B | Outside Employment 2015-SD-0003 |
| 01/20/2015 | Counseling report | APDGO 410.02.B.2 | Offense Report 2015-SD-0004 |
| 07/07/2015 | Written Reprimand | APDGO 502.02.A | Outside Employment 2015-SWRI-0006 |
| 08/22/2016 | Written Reprimand | APDGO 410.02.B.2(d) | Offense Report 2016-SWRI-0007 |
| 11/04/2016 | Written Reprimand | COAPP 201.04.B | Judgment 2016-SWRI-009 |

Thus, before Officer Guadarrama shot his Taser at Mr. Olivas, he had received five written

reprimands and four counseling reports regarding his duty as an Arlington Police Officer.  Nine

such incidents over the course of approximately seven years shows that he was not qualified to

continue in his duties.  Most troubling is that the last five incidents occurred over a period of less

than two years.

> 4.      City of Arlington's Failure to Discipline Sergeant Jefferson and/or Officer Guadarrama is Evidence of Arlington's Pre-Existing Unconstitutional Policy, Practice, and/or Custom

104.     Upon information and belief, Arlington failed to discipline or otherwise take any material adverse employment action against Sergeant Jefferson and/or Officer Guadarrama as a result of the incident involving Mr. Olivas.  Upon information and belief, the City's failure to do so was some evidence of pre-existing policy, practice, and/or custom at the time of the incident. Further, upon information and belief, this policy, practice, and/or custom was a moving force behind and proximately caused Mr. Olivas' death.

## III.     Causes of Action

> A.      Cause of Action Against Defendants Sergeant Jefferson and Officer Guadarrama and Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights

105.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendants Jefferson and Guadarrama are liable to Plaintiffs (including Ms. Ramirez, Gabriel Anthony Olivas, the heirs-at-law of Mr. Olivas, and female minor S.M.O. through Ms. Ramirez acting as her parent, guardian, and next friend), pursuant to 42 U.S.C. § 1983, for violating Mr. Olivas's rights guaranteed by the Fourth Amendment to the United States Constitution, as the Fourth Amendment has been incorporated to be applied to the States pursuant to the Fourteenth Amendment or otherwise.  Defendants Jefferson and Guadarrama acted under color of state law at all times referenced in this pleading.  Defendants Jefferson and Guadarrama were deliberately indifferent to Mr. Olivas's constitutional rights, and they acted in an objectively unreasonable manner when seizing and using force with Mr. Olivas,

as well as performing all other actions, and further failing to act, as referenced in this pleading. They exercised constitutionally-impermissible excessive force and seizure. Defendants Jefferson and Guadarrama violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incident. Defendants Jefferson and Guadarrama were not constitutionally permitted to use the force they chose to use, and they are not entitled to qualified immunity.[1]

106.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983. Therefore, Plaintiffs (including Ms. Ramirez, Gabriel Anthony Olivas, the heirs-at-law of Mr. Olivas, and female minor S.M.O. through Ms. Ramirez acting as her parent,

---

[1]    The defense of qualified immunity is, and should be held to be, a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted. Congress makes laws. Courts do not. However, the defense of qualified immunity is a court-created defense found nowhere in the statute under which Plaintiffs bring claims in this case. Plaintiffs respectfully make a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited. The natural person Defendants cannot show that they would fall within the category of persons referenced in the first sentence of this footnote. This would be Defendants' burden, if they choose to assert the alleged defense. Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring). Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights. Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that Defendants violated clearly established law in only 2 such cases). Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity. *Schwartz, supra* at 1798–99. Plaintiffs include allegations in this footnote to assure that, if necessary, the qualified immunity abrogation or limitation issue has been preserved.

guardian, and next friend) seek all remedies and damages available under Texas and federal law including but not necessarily limited to pursuant to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law. Therefore, Mr. Olivas' estate, and/or his heirs-at-law, whose claims are asserted through Ms. Ramirez as the independent administrator of Mr. Olivas' estate, suffered the following damages, for which they seek recovery from these natural person Defendants:

- Mr. Olivas's conscious physical pain, suffering, and mental anguish;

- Mr. Olivas's medical expenses;

- Mr. Olivas's funeral expenses;  and

- exemplary/punitive damages.

All such damages were caused and/or proximately caused by the natural person Defendants.  If Mr. Olivas had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.

107.    Ms. Ramirez, Gabriel Anthony Olivas, and female minor S.M.O. (such claims being asserted through Ms. Ramirez as S.M.O.'s parent, guardian, and next friend) also seek all damages available to them individually as a result of Mr. Olivas's wrongful death.  Like all other damages alleged in this section of this pleading, damages suffered by these people were caused and/or proximately caused by the natural person Defendants.  Therefore, these people seek and are entitled to obtain all remedies and damages available to them for the 42 U.S.C. § 1983 claims.  The natural person Defendants' actions caused, were proximate causes of, and/or were producing causes of the following damages suffered by these people, for which they individually seek compensation:

- loss of services that Ms. Ramirez would have received from Mr. Olivas;

- Mr. Olivas' funeral expenses;

- past mental anguish and emotional distress suffered by them resulting from and caused by Mr. Olivas' death;

- future mental anguish and emotional distress suffered by them resulting from and caused Mr. Olivas' death;

- loss of companionship and society that they would have received from Mr. Olivas; and

- exemplary/punitive damages.

108.    Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Mr. Olivas' constitutional rights.  The natural person Defendants' actions and/or inaction showed a reckless or callous disregard of, or indifference to, Mr. Olivas' rights and safety.  In addition, all such damages resulted from the natural person Defendants choosing to proceed with conscious indifference to and disregard of Mr. Olivas' rights, safety, or welfare after having an actual subjective awareness of the risk involved but nevertheless proceeding with actions resulting in his injuries and death.  The natural person Defendants' actions, when viewed objectively from their standpoint at the time of the acts and/or omissions involved, resulted in an extreme degree of risk, considering the probability and magnitude of potential harm to Mr. Olivas.  Moreover, Plaintiffs (including Ms. Ramirez, Gabriel Anthony Olivas, the heirs-at-law of Mr. Olivas, and female minor S.M.O. through Ms. Ramirez acting as her parent, guardian, and next friend) seek from the natural person Defendant reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

    B       <u>Cause of Action Against City of Arlington Under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights</u>

109.    In the alternative, without waiving any of the other causes of action pled herein,

without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant City of Arlington is liable to Plaintiffs (including Ms. Ramirez, Gabriel Anthony Olivas, the heirs-at-law of Mr. Olivas, and female minor S.M.O. through Ms. Ramirez acting as her parent, guardian, and next friend), pursuant to 42 U.S.C. § 1983, for violating Mr. Olivas' rights guaranteed by the Fourth Amendment to the United States Constitution, as the Fourth Amendment has been incorporated to apply to the States pursuant to the Fourteenth Amendment or otherwise.  Defendants Jefferson and Guadarrama were at all times referenced in this pleading acting in the course and scope of their duties of and for City of Arlington, and they were acting under color of state law.  The City acted or failed to act under color of state law at all relevant times.

110.    City of Arlington's customs, practices, and/or policies caused, were proximate causes of, and/or were producing causes of all constitutional violations and damages referenced herein.  The Arlington Police Department chief of police was the chief policymaker at all times relevant to this pleading.  In the alternative, some other person was the relevant chief policymaker. Regardless, the Fifth Circuit has made it clear that Plaintiffs need not identify the specific policymaker at this stage of the case.

111.    Plaintiffs incorporate all factual and *Monell* allegations above regarding the basis for City of Arlington's liability in this case.  The City was deliberately indifferent to, and acted in an objectively unreasonably manner regarding, Mr. Olivas' constitutional rights.  The City's customs, practices, and/or policies were moving forces behind and caused violations of Mr. Olivas's constitutional rights and showed deliberate indifference to the known or obvious consequences of such customs, practices, and/or policies:  constitutional violations.  They also

caused, were proximate causes of, and were producing causes of all damages (and death) resulting from unconstitutional excessive force against and seizure of Mr. Olivas.

112.    The United States Court of Appeals for the Fifth Circuit has held that using a State's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Plaintiffs (including Ms. Ramirez, Gabriel Anthony Olivas, the heirs-at-law of Mr. Olivas, and female minor S.M.O. through Ms. Ramirez acting as her parent, guardian, and next friend), seek all remedies and damages available under Texas and federal law including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law. Therefore, Mr. Olivas' estate, and/or his heirs-at-law, whose claims are asserted through Ms. Ramirez as the independent administrator of Mr. Olivas' estate, suffered the following damages, for which they seek recovery from the City:

- Mr. Olivas's conscious physical pain, suffering, and mental anguish;

- Mr. Olivas's medical expenses; and

- Mr. Olivas's funeral expenses.

All such damages were caused and/or proximately caused by the City.  If Mr. Olivas had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.

113.    Ms. Ramirez, Gabriel Anthony Olivas, and female minor S.M.O. (such claims being asserted through Ms. Ramirez as S.M.O.'s parent, guardian, and next friend) also seek all damages available to them individually as a result of Mr. Olivas' wrongful death.  Like all other damages alleged in this section of this pleading, damages suffered by these people were caused

and/or proximately caused by the City and the City's policies, practices, and/or customs were moving forces behind and caused such damages.  Therefore, the City's actions, policies, practices, and customs caused, were proximate causes of, were producing causes of, and were moving forces behind the following damages suffered by these people, for which they individually seek compensation:

- loss of services that Ms. Ramirez would have received from Mr. Olivas;

- Mr. Olivas' funeral expenses;

- past mental anguish and emotional distress suffered by them resulting from and caused by Mr. Olivas' death;

- future mental anguish and emotional distress suffered by them resulting from and caused by Mr. Olivas' death; and

- loss of companionship and society that they would have received from Mr. Olivas.

Moreover, Plaintiffs (including Ms. Ramirez, Gabriel Anthony Olivas, the heirs-at-law of Mr. Olivas, and female minor S.M.O. through Ms. Ramirez acting as her parent, guardian, and next friend) seek from the City reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.


IV.     Concluding Allegations

    A.     Conditions Precedent

114.    All conditions precedent to assertion of Plaintiffs' claims have occurred.


    B.     Use of Documents

115.    Plaintiffs intend to use at one or more pretrial proceedings, in motion practice, and/or at trial all documents produced by Defendants.

C.    Jury Demand

116.    Plaintiffs demand a jury trial on all issues which may be tried to a jury.

D.    Prayer

117.    For these reasons, Plaintiffs ask that Defendants be cited to appear and answer, and that Plaintiffs (including Ms. Ramirez, Gabriel Anthony Olivas, the heirs-at-law of Mr. Olivas, and female minor S.M.O. through Ms. Ramirez acting as her parent, guardian, and next friend) have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally applicable, for damages referenced and/or mentioned elsewhere in this pleading, and for including but not necessarily limited to:

a)    actual damages of and for Ms. Ramirez, Gabriel Anthony Olivas, and female minor S.M.O., individually, including but not necessarily limited to;

- loss of services that Ms. Ramirez would have received from Mr. Olivas;

- Mr. Olivas' funeral expenses;

- past mental anguish and emotional distress resulting from and caused by Mr. Olivas' death;

- future mental anguish and emotional distress resulting from and caused by Mr. Olivas' death; and

- loss of companionship and society that they would have received from Mr. Olivas;

b)    actual damages of and for the heirs of Mr. Olivas through the Independent Administrator of his estate, Ms. Ramirez, including but not necessarily limited to:

- Mr. Olivas' conscious physical pain, suffering, and mental anguish;

- Mr. Olivas' medical expenses; and

• Mr. Olivas' funeral expenses;

c) exemplary/punitive damages for all Plaintiffs (including Ms. Ramirez, Gabriel Anthony Olivas, the heirs-at-law of Mr. Olivas, and female minor S.M.O. through Ms. Ramirez acting as her parent, guardian, and next friend) from the natural person Defendants;

d) reasonable and necessary attorneys' fees for all Plaintiffs (including all heirs at law of Mr. Olivas, Ms. Ramirez, Gabriel Anthony Olivas, and female minor S.M.O. [through Ms. Ramirez acting as her parent, guardian, and next friend]) through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

e) court costs and all other recoverable costs;

f) prejudgment and postjudgment interest at the highest allowable rates;  and

g) all other relief, legal and equitable, general and special, to which Plaintiffs (including Ms. Ramirez, Gabriel Anthony Olivas, the heirs-at-law of Mr. Olivas, and female minor S.M.O. through Ms. Ramirez acting as her parent, guardian, and next friend) are entitled.

Respectfully submitted,


_____/s/ T. Dean Malone_____
T. Dean Malone
Attorney-in-charge
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:         (214) 670-9904
dean@deanmalone.com

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:           (214) 670-9904
michael.oconnor@deanmalone.com

<u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on August 7, 2019 I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a notice of electronic filing to the following attorneys:

        Mr. Robert Fugate
        Ms. Cynthia Withers
        City of Arlington
        City Attorney's Office
        Mail Stop #63-0300
        P.O. Box 90231
        Arlington, Texas  76004-3231

        Attorneys for Defendant City of Arlington

        Mr. Edwin P. Voss, Jr.
        Brown & Hofmeister, L.L.P.
        740 East Campbell Rd., Suite 800
        Richardson, Texas  75081

        Attorneys for Defendant Jeremias Guadarrama

        Mr. Scott D. Levine
        Mr. Baxter W. Banowsky
        Banowsky & Levine, P.C.
        12801 N. Central Expressway
        Suite 1700
        Dallas, Texas  75234

        Attorneys for Defendant Ebony Jefferson

                                        /s/ T. Dean Malone
                                        T. Dean Malone